## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **Layne Wilson,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil No. 13-cv-01351 (APM)** |
| ) | |
| **Deborah Lee James[1],** ) | |
| **Secretary of the Air Force,** *et al.***,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

### MEMORANDUM OPINION

## I.    INTRODUCTION

On December 2, 2012, Plaintiff Layne Wilson, an enlisted member of the Utah Air National

Guard, sent an email, using his military email account, to an official at the United States Military

Academy at West Point objecting to a same-sex wedding held at the military academy's chapel.

Plaintiff's Commanding Officer, Defendant Lt. Colonel Kevin Tobias, learned about the email and

disciplined Plaintiff for it—first, rescinding his six-year reenlistment contract and offering in its

place a one-year contract that Plaintiff later signed; and second, issuing Plaintiff a Letter of

Reprimand.    After Plaintiff challenged these disciplinary actions, Lt. Colonel Tobias

acknowledged error in rescinding the six-year contract and reinstated it, but concluded that the

Letter of Reprimand would remain.    The next day, apparently dissatisfied with this outcome,

Plaintiff posted on his Facebook page the following disparaging remarks about Lt. Colonel Tobias:

"You embarrass me, our country, and our unit!!! . . .   You are part [of] the problem with this

---

[1] Original Defendant Eric Fanning was sued in his official capacity as Acting Secretary of the Air Force.  Since this action was filed, Deborah Lee James was appointed Secretary of the Air Force and replaced Fanning as a named Defendant in this case.

country." That Facebook post, along with other such postings, instigated a second round of discipline, which included another Letter of Reprimand, the opening of a Security Information File, and the suspension of Plaintiff's security clearance.

Believing that the various forms of discipline imposed violated his constitutionally and statutorily protected rights, Plaintiff brought this suit asserting a bevy of claims under the Religious Freedom Restoration Act, the First and Fifth Amendments, the Administrative Procedure Act, and the Privacy Act. Defendants Secretary of the Air Force Deborah Lee James, Lt. General Stanley E. Clarke, Brigadier General Jefferson Burton, and Lt. Colonel Tobias[2] counter, generally, that their actions were lawful, reasonable, and appropriate responses to a series of insubordinate acts.

The manner in which Plaintiff has pled and argued his claims has presented serious challenges to the court. Throughout his Complaint and in subsequent briefing, Plaintiff indiscriminately connects various theories of liability—predicated on the Constitution, statutes, and military regulations—with the different disciplinary actions taken against him, creating a thicket of allegations and claims that are often difficult to discern. In his Complaint, for example, Plaintiff does not clearly identify claims; nor does he concisely link his claims to the specific disciplinary actions he challenges. His briefs are similarly abstruse. They treat each form of imposed discipline as an opportunity to raise multifarious arguments challenging the action's validity. The court has done its best to untangle Plaintiff's inartful pleadings and briefs.

---

[2] The court presumes that James, Clarke, and Burton are sued in their official capacities as Plaintiff does not assert that they were involved in any of the allegedly unlawful actions that are before the court. Tobias was involved in several of those actions, but Plaintiff has not made clear whether he is suing Tobias in his personal or his official capacity. For purposes of addressing Plaintiff's and Defendants' Motions, however, the capacity in which Tobias is sued is of no consequence.

Before the court are Defendants' Motion to Dismiss and for Summary Judgment and Plaintiff's Motion for Summary Judgment.   After considering the parties' arguments and the evidence presented, the court grants Defendants' Motion to Dismiss and for Summary Judgment in its entirety and denies Plaintiff's Motion for Summary Judgment in its entirety.

## II.   BACKGROUND

### A.   The Email to West Point and Resulting Discipline

At all times relevant to this action, Plaintiff was a member of The Church of Jesus Christ of Latter-day Saints ("LDS"), Wilson Aff., ECF No. 17-3, ¶ 3, and an enlisted member of the Utah Air National Guard ("UTANG"), Defs.' Statement of Material Facts, ECF No. 14, ¶¶ 1-2 [hereinafter Defs.' SOF]; Pl.'s Counter Statement of Facts, ECF No. 17-2, ¶¶ 1-2 [hereinafter Pl.'s Counter SOF].

On November 3, 2012, Plaintiff signed a six-year reenlistment contract with both the UTANG and the Federal Air Force Reserve.  Administrative R., ECF No. 7-1, at 27-33 [hereinafter AR].[3]  On an unspecified prior date, Plaintiff had used his military email account to send "abusive and threatening emails" to his medical insurer, TriCare, about a coverage dispute concerning his wife's cancer treatment.  Defs.' SOF ¶ 3; *but see* Pl.'s Counter SOF ¶ 3 (denying that Plaintiff's emails to TriCare were "abusive or threatening").   In response, when Plaintiff signed his reenlistment contract, his superior, Defendant Lt. Colonel Tobias "verbally counseled [P]laintiff on his improper use of government email[.]"  Defs.' SOF ¶ 3; *see also* AR at 46 (November 19, 2012, email from Tobias to TriCare employee in which Tobias writes, "I talked with Layne on 3

---

[3] Although there were no administrative proceedings in this matter, Defendants have filed an "Administrative Record" containing 188 pages of documents relevant to the case.  ECF No. 7.  When citing to the Administrative Record, the court has used the page numbers provided by ECF.

Nov 2012 and I've asked him to stop the inappropriate emails and to tone down his responses to your staff").

One month later, on December 2, 2012, Plaintiff sent an email, using his military account, to Major Jeffery Higgins, whom he believed to be a chaplain at the United States Military Academy at West Point (the "Email").   *See* Pl.'s Counter SOF ¶ 4.   The Email's subject line was: "Homosexuality weddings at military institutions."   AR at 48.   It read as follows:

> Gentlemen:
>
> I just read an article that a homosexual wedding was performed at the Cadet Chapel at West Point.  I need to let you [know], that this is wrong on so many levels. If they wanted to get married in a hotel, that is one thing.  Our base chapels are a place of worship and this [is] a mockery to God and our military core values.  I have proudly served for 27 years and this is a slap in the face to us who have put our lives on the line for this country.  I hope sir that you will take appropriate action so this does not happen again.

*Id.*

At the time he received the Email, Major Higgins was serving as the Executive Assistant to the Commandant of Cadets at West Point.  Pl.'s Counter SOF ¶ 4.  Brigadier General Ted Martin, West Point's Commandant of Cadets, received the Email and forwarded it to Brigadier General David Fountain, Utah's Assistant Adjutant General for Air and the highest-ranking officer in the UTANG, along with the following message:

> I am writing to send you a message I received from one of your Airmen, TSGT L.E. Wilson, who apparently doesn't like the idea of two gay individuals getting married at an on-post facility (in this case, the Cadet Chapel at West Point).  I am not sure why he wrote me—maybe he thinks I care about his opinion (which I don't), or that I am responsible for the policy (which I am not), or that I control the facility (which I don't), but in any event I believe he may have some problems with the lifting of "don't ask, don't tell" and thought that you or his immediate commander might want to further investigate.  If I did control all of the above, he should know that I still don't care about his opinions, and that I am flabbergasted that he would think it is OK to question any of my orders or policies.  I will just hit the delete key on his message and go about my business.

The funny thing about email is that anyone can hit the send key and totally bypass the chain of command.   It is bad enough when a civilian does it, but doubly disappointing when someone in the military does it.   I guess it is just a sign of the times.   I am sure you are busy and have about as much time for this kind of nonsense as I do – which is "zero"!

AR at 47-48.  Brigadier General Fountain forwarded General Martin's email to Brigadier General Kenneth Gammon, who in turn forwarded the email to Tobias.  *Id.* at 47.

Three days after Plaintiff sent the Email, on December 5, 2012, UTANG officials decided to rescind Plaintiff's six-year reenlistment contract and offer in its place a one-year reenlistment contract.  *Id.* at 42; Defs.' SOF ¶ 8.  On December 12, 2012, Tobias met with Plaintiff to discuss the status of his reenlistment contract, the Email, and related matters.  Tobias' notes reflect that, at the meeting, he and Plaintiff discussed a June 2011 "Don't Ask Don't Tell Training," about which Plaintiff "comment[ed] . . . how strongly he disagreed with it at that time and how he feels the same way today."  AR at 43.  Tobias' notes reflect that they also discussed:   (1) Plaintiff's "[p]ossible loss of a stripe" and that "at a minimum he'll be getting a [Letter of Reprimand]"; (2) Plaintiff's retirement, which Tobias "encouraged" him to begin in March or April 2013, "thus allowing him to retire with a clean slate"; Plaintiff, however, stated that he "[w]ants to stay in for at least three more years," at least in part because "TriCare is critical to his wife's cancer" treatment; and (3) termination of Plaintiff's UTANG email account and internet access, which Tobias told Plaintiff should occur immediately, but Tobias decided to "hold for now" because Plaintiff would need his account to make "retirement requests."  *Id.*  Tobias noted that Plaintiff "seemed very adamant that what he did was not wrong [and that] he felt that his rights were being taken from him."  *Id.*  In response, Tobias explained that "we as military members must live under tighter rules/guidelines to have a strong force" and told Plaintiff that "he was basically ordered to

not have that opinion in uniform and that he basically disobeyed this order." *Id.*  Tobias told

Plaintiff that if he "feels so strongly about it maybe it's a good time for him to move on." *Id.*

On December 13, 2012, Plaintiff signed the one-year reenlistment contract.  *Id.* at 45.

Before signing the contract, Plaintiff informed Tobias that his healthcare coverage had ceased

when his six-year reenlistment contract was rescinded.  *Id.* at 44.  Plaintiff also acknowledged his

missteps:  "My National Guard military benefits are being taken away over a human error on my

part . . . .  I didn't intend to create this red tape mess for you.  Again, I'm sincerely sorry I created

this situation and ask for your forgiveness.  I wish[ ] I could undo the past [two] months, but I

can't." *Id.*  Plaintiff also asked Tobias to reinstate his six-year contract:  "I wish[ ] there was some

way for us to come to a compromise on reinstating my [six-]year enlistment." *Id.*

On February 10, 2013, Tobias issued Plaintiff a Letter of Reprimand (the "First LOR"), in

which he wrote:

> On 3 November 2012, I sat down with you to discuss the use of your government
> provided email system and how some emails that you have sent have violated the
> base email policy that is agreed to every time you log into your computer.  During
> this meeting I verbally counseled you and made it clear that you are not to send
> personal emails from your work computer under a [UTANG] signature block.  I
> also stressed during this conversation that if the behavior continued there would be
> repercussions. . . .  [The Email] was in violation of the rules and regulations
> discussed, and [wa]s in direct opposition to the conversation that you and I had on
> 3 November 2012, just the month prior, during which I mentioned that we as
> military members must live under tighter rules and guidelines.  To have a strong
> force, when we raise our arm to the square to support and defend the constitution
> and the leaders appointed over us, while in uniform our opinions and feelings are
> second to following the laws, regulations and decisions of our elected and military
> leaders.  If you have such a strong aversion to those rules and regulations in
> uniform, you have the choice to depart our ranks and live as you please, but while
> in uniform this behavior is not tolerated.  This expectation was reviewed, reinforced
> and you were ordered to stop this behavior, however, you disobeyed this order.
> You are hereby reprimanded!  As a noncommissioned officer, you are expected to
> maintain a standard or professional and personal behavior that is above reproach.
> You have failed!

*Id.* at 8.

Plaintiff was given 30 calendar days to respond to the First LOR, and he did so on March 5, 2013.  Plaintiff explained that he had reviewed the Air Force's policy that "outlines proper use of government communications" and noted that, "[s]ince 4 November 2012," he has "refrained from using government email for TriCare to prevent further misunderstandings."  *Id.* at 10.  He added:  "I believe that I complied with your verbal orders as I understood them on 4 November 2012."  *Id.*  With regard to the Email, Plaintiff wrote:

> The one and only email I sent on 2 December 2012 to head Chaplain – Major Jeffrey Higgins addressed the blasphemous desecration of a military chapel.  My email was short, clear, and to the point; having nothing to do with DADT. . . .  No one should ever have to check their moral values or religious convictions at the door when they put on the uniform.  I must be true [to] myself and to my God above anyone else.  My concern now is that I'm no longer allowed to have an opinion and that I must follow unlawful orders to keep my opinions to myself.  I am not asking anyone to agree with my opinion nor am I asking anyone to change the current policy.  I only ask for respect of my rights of conscience.

*Id.* at 11.

Over the next several months, Plaintiff and his lawyers—John B. Wells and Major Ezra T. Glanzer—communicated with Tobias, other Air Force personnel, and members of Congress, regarding Plaintiff's situation.  *Id.* at 52-66, 73-79, 85-90.  On July 16, 2013, Tobias sent a letter to Plaintiff's counsel informing them that he had "determined there were procedural irregularities in the executing and processing of the [one-year] enlistment agreement" and that Plaintiff's "six year re-enlistment [contract] executed on 3 November 2012 will be reinstated."  *Id.* at 111.  Tobias also informed Plaintiff's counsel that the First LOR would remain in Plaintiff's file, stating that Plaintiff "was not reprimanded for his personal opinion"—which "[m]embers of [the UTANG] have the right to express . . . subject to [the] Code of Conduct and Air Force Standards"—"but rather for communicating his personal opinion using official government email together with his military unit and organization, rank, position, and military contact information."  *Id.* at 111-12.

7

Plaintiff's six-year contract was reinstated on November 13, 2013.  Defs.' SOF ¶ 10; Pl.'s Counter SOF ¶ 9.

### B.    The Facebook Post and Resulting Discipline

On July 14, 2013, two days before he would inform Plaintiff that his six-year reenlistment contract would be reinstated, Tobias filed a "Memorandum for Record" in support of the establishment of a Security Information File on Plaintiff (the "SIF").  AR at 118-22.  Tobias sought to open the SIF "based on [Plaintiff's] conduct in relation to his Facebook postings," *id.* at 119, which were brought to Tobias' attention by other Air Force personnel, *id.* at 119-20.  In the month before filing the Memorandum, Tobias personally had accessed and had reviewed Plaintiff's Facebook page—on which Plaintiff listed his place of work as the UTANG, *id.* at 130—and had become "concerned with his tone, subjects and . . . mental state," *id.* at 121.  On July 15, 2015, Tobias formally requested the establishment of the SIF, which caused Plaintiff to "be placed in a non-sensitive position and [withdrew his] access to classified information and[/]or unescorted entry to restricted areas," *id.* at 128—in other words, Plaintiff's security clearance was suspended.

On July 16, 2013, upon learning from Tobias that his six-year reenlistment contract would be reinstated but that the First LOR would remain in his file, Plaintiff posted on his Facebook page an article about himself, titled "Military Punishes 27 year Veteran Over Personal Beliefs."  *Id.* at 22.  The following statement, written by Plaintiff, accompanied the article (the "Facebook Post"):

> I only want to say one thing to you Kevin Tobias!!!  Sir!!!  You are way out of line!!!  You embarrass me, our country, and our unit!!!  I have done nothing but try to support our constitution and our religious freedoms.  You are part [of] the problem with this country.  I have tried reason with you, use[d] diplomacy with you, but that doesn't seem to work.  Shame on you sir!!!!

*Id.* According to Plaintiff, he put up the Facebook Post "inadvertently"—"When I wrote these words I was venting and I did not intend for the matter to be posted"—and "immediately deleted it." Wilson Aff. ¶ 15.

Evidently, Plaintiff did not take the Facebook Post down fast enough. Another UTANG member read it and sent a screenshot of Plaintiff's critical comments to Tobias. AR at 18. On August 3, 2013, Brigadier General Gammon, UTANG's Commander, issued Plaintiff a second Letter of Reprimand (the "Second LOR"). *Id.* at 20. The Second LOR quoted the Facebook Post and stated:

> You are hereby reprimanded for failing to give your superior commissioned officer and Commander the dignity and respect due his office. You have embarrassed yourself, your unit and the [UTANG]. Your language was patently disrespectful and your conduct demonstrably prejudicial to good order and discipline. You have failed to exemplify the high professional standards expected of Non-Commissioned Officers in the [UTANG]. This conduct cannot and will not be tolerated.

*Id.* The same day the Second LOR issued, Plaintiff's counsel were informed about the SIF and were provided with the materials that supported its opening, including screenshots of 74 Facebook posts. *Id.* at 127.

On September 14, 2013, after the instant suit was filed, Plaintiff's counsel responded to the Second LOR, asserting numerous procedural and substantive challenges and requesting that it "be withdrawn and destroyed" or "filed locally." *Id.* at 25-26. On November 4, 2013, Plaintiff's counsel responded to the SIF, arguing that Plaintiff's Facebook posts were "innocuous" and addressing each post individually. *See* Wells Letter, ECF No. 13-5. Neither Plaintiff nor Defendants have represented that the Second LOR was removed from Plaintiff's file or that his security clearance was reinstated.

### III.   DISCUSSION

#### A.   Standards of Review

##### 1.   *Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)*

Defendants have moved under Federal Rule of Civil Procedure 12(b)(1) to dismiss certain of Plaintiff's claims for lack of subject matter jurisdiction, either on mootness grounds or for lack of standing.  Under Rule 12(b)(1), a court has "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  Plaintiff, however, bears the burden of proving that the court has subject matter jurisdiction to hear his claims.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  "For this reason, 'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  *Grand Lodge*, 185 F. Supp. 2d at 13-14 (citation omitted).

In analyzing a 12(b)(1) motion, a court need not limit itself to the complaint.  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005).  It "may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case."  *Scolaro v. D.C. Bd. of Elections and Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (citations omitted); *see also Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) ("[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." (citations omitted)).

##### 2.   *Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)*

As to other claims, Defendants have moved under Rule 12(b)(6) to dismiss for failure to state a claim on which relief can be granted, including on the ground of nonjusticiability.  *See*

*Sierra Club v. Jackson*, 648 F.3d 848, 853-54 (D.C. Cir. 2011) (clarifying that a challenge to the justiciability of a claim is properly considered under Rule 12(b)(6)).   However, Rule 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).   Here, both parties have presented substantial materials outside the pleadings, including an Administrative Record, and relied on those materials extensively.   And both parties have been "given a reasonable opportunity to present all the material that is pertinent to the[ir] motion[s]." *Id.*[4]   Accordingly, to the extent Defendants raise arguments under Rule 12(b)(6), the court instead will apply the summary judgment standard set forth below.   *See Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 & n.5 (D.C. Cir. 1993) (stating that a district court considering a Rule 12(b)(6) motion "can consult the [administrative] record to answer the legal question[s] before the court," but that "[i]t is probably the better practice for a district court always to convert to summary judgment").

> 3.     *Motion for Summary Judgment Under Federal Rule of Civil Procedure 56*

A court will grant summary judgment only if a movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   In making this determination, the court reviews all "evidence . . . in the light most favorable to the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 245 n.2 (1986).   A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, while a fact is "material" only if it is capable of affecting the outcome of litigation. *Id.* at 248-49. A non-material factual dispute is insufficient to prevent the court from granting summary judgment. *Id.* at 249.

---

[4] Neither party sought discovery before filing its dispositive motion.

On cross-motions for summary judgment "each side concedes that no material facts are at issue," although this applies "only for the purposes of [each side's] own motion" and does not mean that a "party [has] waive[d] the right to a full trial on the merits." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982), *abrogated on other grounds by Berger v. Iron Workers Reinforced Rodmen, Local 201*, 170 F.3d 1111 (D.C. Cir. 1999)); *see also Hodes v. U.S. Dep't of Treasury*, 967 F. Supp. 2d 369, 373 (D.D.C. 2013).  The court will "grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed.  *GCI Health Care Ctrs., Inc. v. Thompson*, 209 F. Supp. 2d 63, 67 (D.D.C. 2002) (citations omitted).

### B.    Claims Predicated on the Decision to Rescind Plaintiff's Six-Year Reenlistment Contract

To begin, Plaintiff asserts that the decision to rescind his six-year reenlistment contract violated the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.*, the First Amendment, and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*  Defendants have moved under Rule 12(b)(1) to dismiss those claims on the ground that they are moot.  Mem. in Supp. of Defs.' Mot. to Dismiss and for Summ. J., ECF No. 14, at 8-9 [hereinafter Defs.' Mot.].  The court agrees that all of Plaintiff's claims challenging the decision to rescind his six-year reenlistment contract fail to present a live case or controversy and thus must be dismissed.

"Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969).  Even where a case, or a claim within a case, involves a live controversy when filed, the mootness doctrine requires federal courts to refrain from rendering a decision "if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Transwestern Pipeline Co. v. FERC*, 897 F.2d

570, 575 (D.C. Cir. 1990).  Although exceptions to the mootness doctrine exist, *see, e.g.*, *Clarke v. United States*, 915 F.2d 699, 703 (D.C. Cir. 1990), Plaintiff has not raised any of them here.

Once Plaintiff's six-year reenlistment contract was reinstated on November 13, 2013, Pl.'s Counter SOF ¶ 9; Defs.' SOF ¶ 10, the decision to rescind that contract no longer presented a live controversy.  *See Gibbs v. Brady*, 773 F. Supp. 454, 457 (D.D.C. 1991) (dismissing as moot federal employee's claim for reinstatement where "voluntary corrective action taken by [the government]" placed the plaintiff in a position "reasonably similar to plaintiff's former position").  Plaintiff already has received the relief he seeks—full reinstatement of the six-year contract and its terms. Thus, Plaintiff's claims challenging the rescission of that agreement are moot and are dismissed for lack of subject matter jurisdiction.

### C.      Plaintiff's Claims Under the Religious Freedom Restoration Act

Moving on to claims that present a live case or controversy, among Plaintiff's primary contentions is that Defendants' issuance of the First LOR placed a substantial burden on his exercise of religion in violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.  See* Compl. ¶¶ 55-56, 60-62.

RFRA provides that the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1.  Thus, the first inquiry under RFRA is whether a government act has substantially burdened the plaintiff's religious exercise.  *See Kaemmerling v. Lappin*, 553 F.3d 669, 677-78 (D.C. Cir. 2008).  In evaluating whether government action has substantially burdened a religious exercise, the court must, as a preliminary matter, identify the religious action or practice that the plaintiff asserts was

substantially burdened.  *See id.* at 679 ("Religious exercise necessarily involves an action or practice").  The religious action or practice need not be "compelled by, or central to, a system of religious beliefs."  42 U.S.C. §§ 2000cc-5(7)(A).  Nor shall the court "determine what religious observance [a plaintiff's] faith commands."  *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 247 (D.C. Cir. 2014).  Instead, courts must look to the religious action or practice the plaintiff identifies as having been substantially burdened, without questioning either whether it is central to the plaintiff's faith or whether the plaintiff sincerely holds his religious beliefs.

Here, Plaintiff has not asserted that the First LOR substantially burdened any religious *action or practice*.  Rather, Plaintiff only asserts that the discipline imposed substantially burdened a religious *belief*, *i.e.*, that same-sex marriage is a sin.  Plaintiff is a member of the LDS faith.  Wilson Aff. ¶ 3.  He states that the "tenets of [LDS] hold[ ] that homosexual acts are a sin" and that he "*believe[s]* that any act, endorsement, sanction, practice or support of the homosexual act on a military installation is inappropriate."  *Id.* (emphasis added).  In his briefs, Plaintiff similarly reiterates that "LDS doctrine holds that homosexual marriage and homosexual activity is a sin," "it is within [his] religious practices to *believe* that," and he "sought to express his religious *beliefs* when he mistakenly believed he was sending an email communication to a Chaplain."  Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for Summ. J., ECF No. 24, at 15 [hereinafter Pl.'s Reply] (emphasis added).  Plaintiff contends that "he is suffering reprisal for voicing [his] *beliefs*."  Mem. in Supp. of Pl.'s Mot. for Summ. J., ECF 13-4, at 14 [hereinafter Pl.'s Mot.] (emphasis added); *see also* Pl.'s Opp'n to Defs.' Mot. to Dismiss and for Summ. J., ECF No. 17, at 11-12 [hereinafter Pl.'s Opp'n] (arguing that "he is being punished for the *belief* that homosexual marriage and homosexual activity is a sin") (emphasis added).

14

A substantial burden on one's religious beliefs—as distinct from such a burden on one's *exercise* of religious beliefs—does not violate RFRA.  The Court of Appeals so concluded in *Kaemmerling*.  There, the plaintiff asserted that the federal government's collection and storage of his DNA sample required him to act in ways that violated "his religious beliefs."  *Kaemmerling*, 553 F.3d at 679.  The Court rejected Plaintiff's RFRA claim, observing that "[r]eligious exercise necessarily involves an action or practice" and that the government's collection and storage of the plaintiff's DNA did not "pressure [him] to modify his own behavior in any way that would violate his beliefs."  *Id.*  Similarly, here, Plaintiff has not identified any burdened action or practice of the LDS faith.  The discipline imposed did not "force[ him] to engage in conduct that [his] religion forbids" or "prevent[ him] from engaging in conduct [his] religion requires," *Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001).  Nor did it "condition[ ] receipt of an important benefit upon conduct proscribed by [his] religious faith, or . . . den[y] such a benefit because of conduct mandated by [his] belief," *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981).  Nothing prevented Plaintiff from continuing to maintain his beliefs about same-sex marriage and homosexuality, just as he had before the First LOR, without repercussion.

Admittedly, the First LOR likely chilled Plaintiff's *speech* regarding his religious beliefs, especially within the military setting.  But nowhere does Plaintiff assert that LDS doctrine requires him to publicly voice his dissent about homosexuality or same-sex marriage.  *See Mahoney v. U.S. Marshals Serv.*, 454 F. Supp. 2d 21, 38 (D.D.C. 2006) (rejecting an asserted RFRA violation where plaintiffs claimed that they wished to engage in speech about their religion but had not alleged that such speech was "part of the exercise of their religion").  Plaintiff only contends that, under LDS doctrine, homosexuality is a sin.  Wilson Aff. ¶ 3.  His religious belief, however, does not become a protected religious exercise under RFRA simply because Plaintiff expressed it through speech.

15

*See Mahoney*, 454 F. Supp. 2d at 38 (observing that "[i]t is not the case that every activity which could be cast as 'religiously motivated' is the kind of exercise of religion protected by RFRA") (citation omitted).

But even if Plaintiff's speech about same-sex marriage could be considered a religious exercise under RFRA, the First LOR did not "substantially burden" it.  The Court of Appeals has found that a neutral regulation that places a limit on where someone may engage in religiously motivated expression does not violate RFRA.  In *Henderson*, the Court of Appeals held that a ban on selling t-shirts on the National Mall that expressed a religious message did not constitute a "substantial burden" on religious exercise.  *See* 253 F.3d at 17 ("Because the Park Service's ban on sales on the Mall is at most a restriction on one of a multitude of means, it is not a substantial burden on their vocation.").  Similarly, in *Mahoney*, the court held that security limitations on where the plaintiffs could protest outside the Red Mass, an annual ceremony at St. Matthew's Cathedral that marks the beginning of the judicial year, did not violate RFRA.  *See* 454 F. Supp. 2d at 38 (finding that there was no RFRA violation where the plaintiffs did not "allege that their religion compels them to demonstrate in favor of the public display of the Ten Commandments at all time and in all places").

A similar result obtains here.  The First LOR punished Plaintiff for voicing his views about same-sex marriage, using his military email account, to a senior officer outside his chain of command.  That is all.  It did not bar him from voicing his opposition to same-sex marriage in other fora or by other means, and certainly not in his private affairs.  Such disciplinary action does not rise to a RFRA violation.[5]  Accordingly, the court grants Defendants' Motion for Summary Judgment as to Plaintiff's RFRA claim.

---

[5] Because Plaintiff failed to establish that a government action substantially burdened his exercise of religion, the court need not address in detail whether the issuance of the First LOR was in furtherance of a compelling governmental

### D.    Plaintiff's First Amendment Claims

The court next considers Plaintiff's First Amendment claims, which fall into two categories—abridgement of his right to free speech and abridgement of his right to free exercise. In a related argument, Plaintiff asserts that Air Force Instruction 1-1, which he claims was a basis for the disciplinary actions taken against him, violates the First Amendment "facially and as applied." Pl.'s Mot. at 26.

#### 1.    Freedom of Speech

"While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections." *Parker v. Levy*, 417 U.S. 733, 758 (1974). Unlike civil society, the military "'is not a deliberative body. It is the executive arm. Its law is that of obedience.'" *Id.* at 744 (quoting *In re Grimley*, 137 U.S. 147, 153 (1890)). Such obedience, order, and discipline "cannot be taught on battlefields; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection." *Chappell v. Wallace*, 462 U.S. 296, 300 (1983). And so "[t]he military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) (citations omitted).

Further, the Supreme Court has observed that "the established relationship between enlisted military personnel and their superior officers . . . is at the heart of the necessarily unique

---

interest and was the least restrictive means of furthering that interest. Nevertheless, the court observes that RFRA "was enacted against a known backdrop of longstanding precedent involving judicial deference to military authorities," *Singh v. McHugh*, No. 14-cv-1906, 2015 WL 3648682, at *12 (D.D.C. June 12, 2015), and that there is a "substantial Government interest . . . in maintaining the respect for duty and discipline so vital to military effectiveness," *Brown v. Glines*, 444 U.S. 348, 348 (1980); *see also Rigdon v. Perry*, 962 F. Supp. 150, 162 (stating that a "politically-disinterested military [and] good order and discipline . . . are compelling governmental interests"). Particularly given that Plaintiff previously was counseled for personal use of his military email account, the court finds that the issuance of the First LOR was in furtherance of a compelling governmental interest and was a reasonable exercise of the discretion afforded to the military in matters of good order and discipline.

structure of the military establishment." *Chappell*, 462 U.S. at 300. "The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it." *Parker*, 417 U.S. at 758. Thus, speech by a member of the military that undermines the chain of command, and the obedience, order, and discipline it is designed to ensure, does not receive First Amendment protection. *See Millican v. United States*, 744 F. Supp. 2d 296, 307 (D.D.C. 2010).

Here, the words that gave rise to the disciplinary actions taken against Plaintiff are unprotected speech. The Email was directed to a senior officer at West Point, previously unknown to Plaintiff, who was outside his chain of command. In the Email, Plaintiff not only expressed disagreement with the decision to allow a same-sex marriage ceremony to occur in West Point's chapel, but also urged a senior officer "to take appropriate action so this does not happen again." AR at 48. The impropriety of Plaintiff's email was succinctly stated by Brigadier General Martin, the Commandant of Cadets at West Point: "I am not sure why he wrote me . . . . [H]e should know that I . . . don't care about his opinions, and that I am flabbergasted that he would think it is OK to question any of my orders or policies." *Id.* An email from an enlisted member of the military that protests the decision of a senior military official outside the sender's chain of command and urges that official to reverse his decision receives no First Amendment protection.

Plaintiff's rant against his commanding officer, Lt. Colonel Tobias, is afforded even less First Amendment protection. In the Facebook Post, Plaintiff wrote about Tobias: "You are way out of line!!!  You embarrass me, our country, and our unit!!! . . .  You are part [of] the problem with this country. . . . Shame on you sir!!!!" *Id.* at 22. It goes without saying that speech by a subordinate that publicly denigrates and humiliates a commanding officer is not entitled to the First Amendment's protections.

18

2.      *Free Exercise Clause*

Plaintiff also has failed to allege a violation of the Free Exercise Clause.  The Free Exercise

Clause provides that "Congress shall make no law respecting an establishment of religion, or

prohibiting the free exercise thereof[.]"  U.S. Const. amend. I.  "At a minimum, the protections of

the Free Exercise Clause pertain if the law at issue discriminates against some or all religious

beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."  *Church*

*of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (citations omitted).

If a law is aimed at "infring[ing] upon or restrict[ing] practices because of their religious

motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and

is narrowly tailored to advance that interest."  *Id.* at 533.  If, however, the law is both neutral and

of general applicability, no compelling interest need be shown—"the right of free exercise does

not relieve an individual of the obligation to comply with a valid and neutral law of general

applicability on the ground that the law proscribes (or prescribes) conduct that his religion

prescribes (or proscribes)."  *Employment Division*, 494 U.S. at 872, 879 (citations omitted)

(internal quotation marks omitted).  In other words, a plaintiff who fails to allege that the

challenged law "is not, in theory or practice, a religion-neutral, generally applicable law . . . alleges

no Free Exercise violation, even if the [law] incidentally affects religiously motivated action."

*Kaemmerling*, 553 F.3d at 677.

Here, aside from Air Force Instruction 1-1, which he lacks standing to challenge, *see infra*

Part III.D.3, Plaintiff has not pointed to any law or regulation whose application allegedly violated

the Free Exercise Clause.  The record reflects only one statute and one military regulation as legal

grounds for the issuance of the LORs.  Title 10 U.S.C. § 8013 is listed on both LORs as "authority"

for their issuance, *see* AR at 9, 20, and Air Force Manual 33-152, which governs Air Force

members' use of "internet-based capabilities" and "electronic messaging," *id.* at 12-15, was identified by Colonel Ronald Blunck as the basis for the issuance of the First LOR in a memorandum he prepared explaining Plaintiff's discipline, *id.* at 79.   Both are neutral laws of general applicability, which do not offend the Free Exercise Clause.   And even if the court found that Plaintiff did have standing to challenge Air Force Instruction 1-1, it too is neutral and generally applicable and thus does not implicate free exercise concerns.   Therefore, Plaintiff has not alleged a Free Exercise Clause violation.

### 3.  Constitutionality of AF 1-1

Within the context of his First Amendment claims, Plaintiff asks the court to declare Air Force Instruction 1-1, known as "AF 1-1," unconstitutional under the First Amendment. Compl. ¶ 117; Pl.'s Mot. at 23-28, 43-44.   Generally speaking, AF 1-1 is a standards policy for members of the Air Force.   *See* AFI 1-1 (7 August 2012), ECF No. 13-7 [hereinafter AF 1-1].   One of its many sections addresses the "Use of Social Media."   *See id.* § 2.15.   Plaintiff challenges the constitutionality of that section, contending that it is "void for vagueness" because its enforcement is left to the "unbridled discretion" of the Air Force; it is "overbroad"; and it "chills the free speech, including political and religious speech, of National Guardsmen."   Pl.'s Mot. at 43; *see also* Compl. ¶¶ 91-95.   Defendants argue that Plaintiff lacks standing to challenge the constitutionality of AF 1-1.   *See* Defs.' Mot. at 24-25.   The court agrees.

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies."   U.S. Const. art. III, § 2.   Rooted in this constraint is the concept of standing, which requires that a plaintiff establish three things in order to maintain a claim:   "First, the plaintiff must have suffered an injury in fact"; "[s]econd, there must be a causal connection between the injury and the conduct complained of"; and "[t]hird, it must be likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (citations omitted) (internal quotation marks omitted).   On a motion for summary judgment, a plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" that support each of the three elements.   *Id.* at 561 (citing Fed. R. Civ. P. 56(e)).   Here, Plaintiff has failed to carry his burden as to the "causal connection" requirement of standing, because he has not offered any evidence showing that either LOR or any other discipline imposed is fairly traceable to his superiors' application of AF 1-1.   *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976).

The First LOR nowhere mentions AF 1-1.   Indeed, it does not specify which Air Force regulation or policy Plaintiff violated.   And Plaintiff has not presented any evidence that Tobias or anyone else told him, verbally or in writing, that he was disciplined because the Email violated AF 1-1.   In an effort to link AF 1-1 to Tobias' actions, Plaintiff points to a single line in a June 19, 2013, memorandum written by Colonel Ronald Blunck, UTANG's Director of Staff, in response to complaints Plaintiff made to a Member of Congress.   AR at 76-79.   In his memorandum, Colonel Blunck wrote:   "Tobias['] response is in complete harmony with . . . [AF] 1-1 paragraph 2.12.2[, which] states 'Your right to practice your religious beliefs does not excuse you from complying with directives, instructions, and lawful orders.'"   *Id.* at 79; *see also* Pl.'s Reply at 21. But Colonel Blunck's post-hoc statement that the First LOR was in "complete harmony" with AF 1-1 does not establish that Tobias actually relied on AF 1-1 or applied it when he issued the First LOR.   The memorandum appears to be Colonel Blunck's after-the-fact analysis of Tobias' actions; it is not evidence that Tobias actually applied AF 1-1.   Indeed, Colonel Blunck did not even say in the memorandum that he had spoken to Tobias or that Tobias had told him what regulation he relied upon to discipline Plaintiff.   Based solely on Colonel Blunck's memorandum, the court cannot "fairly trace" the First LOR to AF 1-1.

The Second LOR similarly cannot be traced to the challenged Air Force policy.  Indeed, the parties agree that the regulation does not apply to off-duty conduct like Plaintiff's public rebuke of his commanding officer on Facebook.  Pl.'s Mot. at 25 ("[T]he Air Force only has jurisdiction over plaintiff when on active duty[.] . . .  Consequently, the Air Force had no jurisdiction over Plaintiff when he wrote the Facebook post concerning Defendant Tobias[.]"); Supplemental Mem. in Supp. of Defs.' Mot. to Dismiss and for Summ. J., ECF No. 29, at 6 ("Plaintiff claims that AF 1-1 did not apply to him in civilian status, and he was in civilian status when he made his Facebook posts that resulted in the [Second LOR]; Defendants agree[.]").  Thus, having failed to establish a "causal connection" between AF 1-1 and either of the LORs, Plaintiff lacks standing to challenge the regulation's constitutionality.[6]

### E.      Plaintiff's Claims Under the Due Process Clause of the Fifth Amendment

Moving from the First to the Fifth Amendment, Plaintiff asserts that the adverse personnel actions taken against him infringed his "liberty and property interest in his career."  Pl.'s Mot. at 44-45; Pl.'s Opp'n at 40-42.  He also asserts that Defendants' failure "to provide specific information as to which of the 74 Facebook pages they believe calls Plaintiff's allegiance to the United States" into question deprived him of due process.  Pl.'s Mot. at 44.

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. V.  "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  To prevail on a Due Process Clause claim, a plaintiff must

---

[6] Plaintiff also claims that AF 1-1 is "inconsistent with . . . RFRA and the 2013 NDAA as implemented by DOD Directive 1300.17."  Pl.'s Mot at 26.  The court's conclusion that Plaintiff lacks standing to challenge the constitutionality of AF 1-1 disposes of those claims as well.

demonstrate, first, that he was deprived by the government of a "liberty or property interest" to which he had a "legitimate claim of entitlement;" and second, that "the procedures attendant upon that deprivation were constitutionally [in]sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

   1.   *Plaintiff's Liberty and Property Interests in His Employment and His Career*

Plaintiff asserts that he has a "liberty interest in not being improperly separated from the military service" and "a property interest in his military career." Pl.'s Opp'n at 40-41. In support of these allegations, he states that "the threat of an early discharge coupled with the stigma of the suspended security clearance certainly implicate[s] Plaintiff's good name, reputation and integrity," as do the LORs. *Id.* at 41. He further speculates that "Defendants' attempts to remove him from . . . the UTANG are far from over." Pl.'s Reply at 24.

To allege a *liberty* interest in government employment, a plaintiff must claim a "discharge . . . *or at least a demotion in rank and pay*." *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998) (citation omitted) (internal quotation marks omitted); *see also Smith v. Harvey*, 541 F. Supp. 2d 8, 12, 16 (D.D.C. 2008) (finding that a member of the Army Reserves who received "a suspension of favorable personnel action, also known as a flag, on [her] personnel file" had "not been discharged from employment or demoted, and [thus] failed to allege a constitutionally-protected liberty interest"). And to allege a *property* interest in government employment, a plaintiff must demonstrate that he was deprived of a benefit "created by sources independent of the constitution," such as a "statute, contract, or other independent source of law." *Harvey*, 541 F. Supp. 2d at 15-16.

Plaintiff has failed to allege a cognizable liberty interest in his employment with the military, as he was not discharged or demoted in rank or pay. Nor has he alleged a cognizable

property interest, as UTANG did not deprive him of any benefit to which the law entitles him. These deficiencies are fatal to Plaintiff's due process claim. *See Roberts v. United States*, 741 F.3d 152, 162 (D.C. Cir. 2014) ("[Plaintiff Naval Officer] says she has a property interest in her 'employment' and a liberty interest in her 'freedom to practice her chosen profession,' but these are not implicated because [she] remains employed by the Navy.").

2.     *Failure to Identify Particular Facebook Postings*

Plaintiff also argues that Defendants deprived him of due process of law in connection with opening the SIF and revoking his security clearance. In support of this claim, Plaintiff asserts that "Defendants deprived [him] of reasonable notice as to the allegations against him" and "[a]s a result, these allegations are too vague to determine whether or not Plaintiff's allegiance has been placed at issue, [which] prejudice[s] his ability to prepare a response." Pl.'s Mot. at 44. In particular, Plaintiff argues that Defendants should have specified which Facebook posts they relied upon to make adverse determinations about his security-worthiness. *Id.* He also claims that "the lack of specificity is a violation of DOD Directive 5200.2 and DOD 5200-2-R." *Id.*

The Supreme Court has made clear that "[p]rocess is not an end in itself." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983). Rather, "[i]ts constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Id.*; *see also Roberts*, 741 F.3d at 162 (dismissing due process claims of plaintiff who had alleged that "she ha[d] a 'liberty and property interest in a fair evaluation process'" because "a 'fair evaluation process' is still a process, not a substantive interest in liberty or property"). Thus, "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.' Only after finding the deprivation of a protected interest do we

24

look to see if the [government's] procedures comport with due process." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citations omitted).

Plaintiff "does not have a liberty or property interest in [a] security clearance, so his security clearance cannot serve as a predicate liberty or property interest." *Palmieri v. United States*, 72 F. Supp. 3d 191, 206 (D.D.C. 2014).   And, even if his security clearance were to give rise to a protected interest, Plaintiff has not identified any Air Force regulation or any other applicable rule that entitles him to disclosure of the specific Facebook posts that Tobias relied on to open the SIF and to revoke his security clearance.   Plaintiff simply claims that Defendants violated two DOD Directives, without explaining why those Directives are applicable or how they were contravened.   Pl.'s Mot. at 44.   Therefore, the court grants summary judgment in favor of Defendants on Plaintiff's Fifth Amendment claims.

## F.     Plaintiff's Administrative Procedure Act Challenge to the LORs

Plaintiff also seeks review of the disciplinary actions taken against him under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*   In this section, the court considers Plaintiff's arguments with respect to the two LORs.   His challenges under the APA to the security-related discipline he received are addressed in the next section.

Plaintiff advances two main arguments that challenge the LORs under the APA.   First, he argues that the issuance of the LORs was arbitrary and capricious.   Second, he asserts that the LORs do not accord with Department of Defense ("DOD") Directive 7050.06, which implements the Military Whistleblower Protection Act, 10 U.S.C. § 1034.   Defendants argue that Plaintiff's challenge to the LORs is nonjusticiable.   They also contend that Plaintiff did not exhaust his administrative remedies insofar as his claim rests on the assertion that the LORs violated DOD Directive 7050.06.   Both of Defendants' arguments are correct.

1.      *Nonjusticiability of the LORs*

"The complex subtle, and professional decisions as to the composition, training, equipping,

and control of a military force are essentially professional military judgments, subject *always* to

civilian control of the Legislative and Executive Branches." *Gilligan v. Morgan*, 413 U.S. 1, 10

(1973); *see also Orloff v. Willoughby*, 345 U.S. 83, 93-94 (1953) ("The responsibility for setting

up channels through which [military] grievances can be considered and fairly settled rests upon

the Congress and upon the President of the United States and his subordinates."). Accordingly,

the jurisdiction of federal courts concerning military personnel decisions is "typically limited to

challenges to *procedures*—it does not extend to the *merits*." *Reilly v. Sec'y of the Navy*, 12 F.

Supp. 3d 125, 140 (D.D.C. 2014); *see also Orloff*, 345 U.S. at 94 ("The military constitutes a

specialized community governed by a separate discipline from that of the civilian. Orderly

government requires that the judiciary be as scrupulous not to interfere with legitimate Army

matters as the Army must be scrupulous not to intervene in judicial matters."); *Burt v. Winter*, 503

F. Supp. 2d 388, 390 (D.D.C. 2007) (stating that "military personnel decisions themselves lie

outside the court's jurisdiction"). Decisions within this Circuit routinely have found military

personnel actions—including promotions, discharges, and discipline—to be nonjusticiable. *See,*

*e.g.*, *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989) (Air Force Major's

claim for retroactive promotion is nonjusticiable); *Daniels v. U.S.*, 947 F. Supp. 2d 11, 19 (D.D.C.

2013) (decision to discharge midshipmen from the U.S. Naval Academy is nonjusticiable); *Caez*

*v. United States*, 815 F. Supp. 2d 184, 188 n.4. (D.D.C. 2011) (holding that underlying "adverse

personnel actions . . . including a [Memorandum of R]eprimand . . . are *not* reviewable by this

Court"); *Charette v. Walker*, 996 F.Supp. 43, 50 (D.D.C. 1998) ("[The] plaintiff's request for

reinstatement and promotion reconsideration are clearly not justiciable because consideration of

these claims would require this Court to intrude upon military personnel decisions committed exclusively to the legislative and executive branches.").

Here, Plaintiff directly challenges whether his conduct warranted the LORs. For instance, with regard to the Second LOR, Plaintiff contends that Defendants intended to "ensnare and ambush [him] to construct a reason for discipline" and "[w]hen he accidentally posted a [Facebook] post critical of Defendant Tobias, they sprung the trap." Pl.'s Mot. at 33. He adds that the "quick action taken by Plaintiff when he accidentally posted the Facebook entry should have obviated the need for an LOR." *Id.* at 34. That is precisely the type of argument that the courts are not permitted to address. Granting the relief Plaintiff seeks—removal of the LORs from his official record, Compl. at 24—would require this court to second-guess the wisdom of a military decision to reprimand Plaintiff. The court is ill-equipped to make such a judgment. *See Kreis*, 866 F.2d at 1511.

### 2. *DOD Directive 7050.06*

Plaintiff alternatively seeks review of the LORs under the APA on the ground that they were issued in violation of DOD Directive 7050.06.[7] Generally speaking, DOD Directive 7050.06 protects military personnel from reprisal for making certain types of "protected communications," which are defined under the Military Whistleblower Protection Act ("MWPA"), 10 U.S.C. § 1034. *See Hernandez v. United States*, 38 Fed. Cl. 532, 535 (1997) (stating that the purpose of the MWPA is "to provide a degree of protection to military personnel who report information on improper or illegal activities by other military personnel"). Plaintiff asserts that the First LOR was issued in

---

[7] Plaintiff clarified in his Opposition Brief that he "does not attempt to state a private cause of action . . . under the [MWPA]. Rather, Plaintiff's Complaint moves for relief under the implementing DOD directives violated by Defendant." Pl.'s Opp'n at 35. Because Directive 7050.06 also does not create a private cause of action, and because Plaintiff addressed this claim in the APA sections of his filings, the court interprets this claim as one challenging the LORs under the APA for failure to adhere to DOD Directive 7050.06.

retaliation for his objecting to the use of West Point's chapel for a same-sex marriage ceremony. And the Second LOR, he contends, was issued in retaliation for his communication with a Member of Congress about the First LOR.

The problem Plaintiff faces here is that he did not raise either of these arguments through the established administrative channels. The MWPA and DOD Directive 7050.06 provide a comprehensive remedial scheme by which investigations, review, and appeals of allegedly retaliatory actions are to be conducted. *See Hernandez*, 38 Fed. Cl. at 536 ("Congress designed the [MWPA] to provide channels within the military through which members of the armed forces could bring their grievances."); *see also Klingenschmitt v. United States*, 119 Fed. Cl. 163, 185 (2014) (observing that "the statute provides a fairly elaborate administrative process for handling complaints of retaliatory personnel actions"). The MWPA provides that, upon receiving a complaint of a prohibited action, the Inspector General of the DOD or an Inspector General of one of the armed forces "shall" determine if there is sufficient evidence to warrant an investigation and, if there is, to conduct an investigation. 10 U.S.C. § 1034(c)-(d). Upon completing an investigation, the Inspector General is required to report the results to the Secretary of Defense and the Secretary of the military department concerned. *Id.* §1034(e). Then, after receipt of the report, the Secretary "shall" determine if there is a sufficient basis to conclude whether a prohibited act occurred and, if she determines it has sufficient evidence, shall take the necessary action to correct affected records. *Id.* § 1034(f). A member of the armed forces who is not satisfied with the disposition of a matter, "upon completion of all administrative review," can seek review by the Secretary of Defense, who must render a decision within 90 days. *Id.* § 1034(h).

Additionally, under the MWPA, boards for the correction of military records are empowered to review an application submitted by a member of the armed forces who has alleged

a prohibited personnel action.  *Id.* § 1034(g).  The Secretary concerned is required to issue a final

decision as to an application filed with a records correction board and to take, within 180 days of

the application being filed, such action "as is necessary to correct the record."  *Id.* § 1034(g)(4)-

(5).  The MWPA adds:  "If the Secretary fails to issue such a final decision within that time, the

member or former member shall be deemed to have *exhausted* the member's or former member's

*administrative remedies* under section 1552 of this title."  *Id.* (emphasis added).

DOD Directive 7050.06 implements the provisions of the MWPA.  DOD Directive

7050.06, ECF No. 25-1.  It establishes detailed procedures applicable to the DOD Inspector

General, DOD "Component Heads," the Secretaries of the military departments, boards of

correction of military records, and the Secretary of Defense.  *Id.* at 4-9.  These procedures govern

investigations, the creation of investigation reports, review of investigation reports, determinations

regarding violations of the MWPA, and appeals of such determinations.  *Id.*

There can be little doubt that, where Congress and the DOD have developed such a

comprehensive scheme to address allegations of retaliatory conduct, an aggrieved member of the

military, like Plaintiff, must first exhaust administrative remedies before coming to federal court

and seeking review under the APA.  *See* 5 U.S.C. § 704 (permitting judicial review of a "final

agency action");  *see also Hernandez*, 38 Fed. Cl. at 536 (concluding that the MWPA "affords

members of the armed forces solely administrative remedies");  *Acquisto v. United States*, 70 F.3d

1010, 1011 (8th Cir. 1995) (same);  *Career Educ., Inc. v. Dep't of Educ.*, 6 F.3d 817, 820 (D.C.

Cir. 1993) (requiring exhaustion "in order to give the Department's top level of appeal an

opportunity to place an official imprimatur on the Department's interpretation of its regulations

before it is reviewed by a federal court");  *Penland v. Mabus*, 78 F. Supp. 3d 484, 494 (D.D.C.

2015) (holding with respect to the MWPA that, "when Congress has established a specific form

29

of redress, it precludes alternative fora"); *Conservation Force v. Salazar*, 919 F. Supp. 2d 85, 90 (D.D.C. 2013) (stating that "if the APA and/or an agency rule provides for a review process, an aggrieved party must exhaust that process before seeking judicial review").

Here, Plaintiff made no effort to avail himself of available administrative remedies before filing suit. *See* Logrande Decl., ECF No. 14-5, ¶ 2. He neither filed a complaint with the Air Force's Inspector General nor sought correction of his personnel record by the Air Force Board for Correction of Military Records ("AFBCMR"). Plaintiff makes the internally inconsistent argument that, while he is protected by the MWPA and DOD Directive 7050.06, he is exempt from its administrative scheme. He argues that, because his case "deals with a National Guard matter," and the AFBCMR does not have the power to correct UTANG records, he was not required to exhaust remedies before coming to federal court. Pl.'s Opp'n at 37. The court takes no position on Plaintiff's contention that the AFBCMR is powerless to remove the LORs from his personnel file. What is clear is that Plaintiff could have filed a MWPA complaint with the Air Force's Inspector General, but he did not do so. *See Appleby v. Harvey*, 517 F. Supp. 2d 253, 261-62 (D.D.C. 2007) (holding that Army's Inspector General has the legal authority to investigate alleged violations of the MWPA by members of the National Guard of the United States). Accordingly, Plaintiff's challenge to the LORs under the MWPA and DOD Directive 7050.06 must be dismissed for failure to exhaust available remedies.

### G.  Plaintiff's Various Claims Challenging Security-Related Actions

Plaintiff challenges the security-related actions taken against him—the opening of the SIF and the revocation of his security clearance—on both constitutional and statutory grounds. Those claims, however, are nonjusticiable under *Department of the Navy v. Egan*, 484 U.S. 518 (1988).

In *Egan*, the Supreme Court held that an administrative review board lacked the authority to review the merits of the Navy's decision to revoke an employee's security clearance. *Id.* at 526-27. The Court acknowledged the ordinary presumption that agency action is reviewable, but declared that the presumption "runs aground when it encounters concerns of national security." *Id.* at 527. "For 'reasons . . . too obvious to call for enlarged discussion,'" the Court stated, "the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it." *Id.* at 529 (citation omitted). For this reason, "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Id.*

Our Court of Appeals consistently has barred judicial review when evaluating a plaintiff's claim would require a court to second-guess the merits of a security clearance-related decision. *See, e.g.*, *Foote v. Moniz*, 751 F.3d 656, 659 (D.C. Cir. 2014) (affirming dismissal of a Title VII claim because "the decision whether to certify an applicant . . . like the decision whether to grant a regular security clearance, is 'an attempt to predict' an applicant's 'future behavior and to assess whether, under compulsion of circumstances or for other reasons, he might compromise sensitive information'") (citation omitted); *Bennett v. Chertoff*, 425 F.3d 999, 1000, 1002 (D.C. Cir. 2005) (affirming under *Egan* the dismissal of a Title VII claim, the analysis of which would require "the trier of fact . . . to consider the merits of th[e] defense" that the plaintiff was fired because of "her inability to sustain a security clearance") (citations omitted) (internal quotation marks omitted);

*Ryan v. Reno*, 168 F.3d 520, 524 (D.C. Cir. 1999) ("[U]nder *Egan* an adverse employment action based on denial or revocation of a security clearance is not actionable under Title VII").

A straightforward application of these cases requires dismissal of Plaintiff's statutory claims under RFRA and the APA that challenge both the opening of the SIF and the revocation of Plaintiff's security clearance.  Any judicial inquiry into those decisions necessarily would require the court to ensnare itself in the "predictive judgment" of those with "expertise in protecting classified information." *Rattigan v. Holder*, 689 F.3d 764, 767 (D.C. Cir. 2012) (citation omitted) (internal quotation marks omitted).  Indeed, this case is nearly on all fours with *Egan*, as *Egan* itself disallowed review of a revocation of a security clearance, the very type of decision that Plaintiff seeks to challenge here.

Plaintiff attempts to escape from under *Egan* by arguing that he "is not asking the court to examine the merits of the Defendants' decision to revoke his security clearance. . . .  Rather, Plaintiff's claims are regarding the constitutional violations that occurred in the decision making process to suspend the clearance and open the SIF."  Pl.'s Reply at 11.  But the court already has held that Defendants' actions did not violate Plaintiff's First Amendment speech and free exercise rights.  Therefore, the court need not decide to what extent Plaintiff's constitutional challenges would enable him to avoid the *Egan* bar.  *See Ryan*, 168 F.3d at 524 (observing that *Egan* "does not apply to actions alleging deprivation of constitutional rights").

## H.    Plaintiff's Privacy Act Claim

Plaintiff's final claim arises under the Privacy Act, 5 U.S.C. § 552a, and consists of two distinct grievances.  Plaintiff first asserts that Defendants' refusal to "expunge" the LORs from his personnel file violated the Privacy Act.[8]   Compl ¶¶ 80-82.  That claim is disposed of easily.

---

[8] Only Defendants have moved for summary judgment on this aspect of Plaintiff's Privacy Act claim.  *Compare* Defs.' Mot. at 36-39 *with* Pl.'s Mot. at 40-41.

Section 552a(d) provides that "[a]n individual seeking amendment of a record must . . . request amendment of the record [by the concerned agency] and, if the request is denied, request review [within the concerned agency] of the denial." *Blazy v. Tenet*, 979 F. Supp. 10, 18 (D.D.C. 1997); *see also* 5 U.S.C. § 552a(d)(2)-(3).   Only after following this two-step process may an individual seek judicial review.  *Leighton v. C.I.A.*, 412 F. Supp. 2d 30, 35 (D.D.C. 2006).   Though Plaintiff's counsel did request that the LORs be expunged in their entirety, *see* AR at 26, 90; Pl.'s Opp'n at 39, Plaintiff has not shown that the requests were made under the Privacy Act or were directed to the proper official under applicable Air Force regulations, *see* Air Force Instruction 33-332, § 2.8 (2015) (requiring that Privacy Act requests be directed to the systems manager of the records in question).[9]   Further, Plaintiff has not alleged or presented any evidence indicating that he sought administrative review of the denial of his requests for expungement.  *See* Owen Decl., ECF No. 14-6, ¶ 2.   His Privacy Act claim for amendment of records therefore is dismissed for failure to exhaust administrative remedies.[10]

Plaintiff's second Privacy Act claim is unrelated to the first.   Plaintiff asserts that a UTANG public affairs officer improperly disclosed private medical information when responding to a press inquiry.  Compl. ¶¶ 83-85.   Some background is in order.   On July 19, 2013, a story appeared on the internet reporting that, as a result of the Email and the Air Force's initial decision to rescind Plaintiff's six-year reenlistment contract, he lost his health care insurance.   His wife, who was suffering from cancer, depended on the insurance for her treatment.   Mem. in Opp'n to Pl.'s Mot. for Summ. J., ECF No. 19, at 29.   The story quoted Plaintiff's counsel as stating, "Tobias'[ ] earlier

---

[9] Available at http://static.e-publishing.af.mil/production/1/saf_cio_a6/publication/afi33-332/afi33-332.pdf.

[10] Alternatively, Plaintiff has failed to state a records correction claim under the Privacy Act, because he has not shown that the LORs contain any inaccurate facts.  *See Leighton*, 412 F. Supp. 2d at 33, 36-37 (stating that "[t]he Privacy Act generally provides a means for individuals to seek removal of any records in their personnel file that contain inaccurate facts. . . .  [A]ctions under the Privacy Act are not sustainable if they seek to remove subjective or opinion-oriented statements in the person's file.").

actions in pulling the six-year contract led to a break in service and a loss of benefits." *Id.*  In

August 2013, a "concerned citizen" emailed Utah's governor criticizing Tobias' decision to

rescind the contract and asking the governor to prevent such future "abuses."  AR at 185.

Lt. Colonel Hank McIntire, UTANG's Public Affairs officer, responded to the citizen's inquiry.

In an email that Plaintiff now asserts violated the Privacy Act, McIntire wrote:

> Media reports and Tech. Sgt. Wilson's attorney have inaccurately claimed that
> Tech. Sgt. Wilson's health insurance benefits were discontinued as a direct result
> of his e-mail regarding the West Point chapel.  Due to privacy laws and possible
> litigation by Tech. Sgt. Wilson, we are limited in the amount of information we are
> able to share here.  However, the discontinuance of his medical benefits was not
> tied—neither directly nor indirectly—to command action; rather, the benefits were
> discontinued for other reasons that were completely within Tech. Sgt. Wilson's
> control.

*Id.* at 184.  Plaintiff argues that McIntire's email violated the Privacy Act, not because it disclosed

a break in coverage due to the contract rescission, but because it disclosed "a short interruption in

benefits arising out of a dispute between Tricare and Plaintiff, that was later corrected.  This was

private medical information *not previously disclosed outside of the agency*."  Pl.'s Opp'n at 40.

Plaintiff's argument is utterly confounding.  Apparently, he believes that the statement "the

benefits were discontinued for other reasons" amounted to an unlawful public disclosure of a

dispute that he had with his insurer.  Even if by "for other reasons" McIntire meant Plaintiff's

dispute with TriCare—which is not at all established on this record—his email cannot plausibly

be read to reveal what Plaintiff claims.  Nowhere is TriCare mentioned.  Nowhere is a dispute

mentioned.  And nowhere is a dispute with TriCare mentioned.  McIntire's email did not disclose,

let alone improperly disclose, information that is protected under the Privacy Act.  Judgment

therefore will be entered in favor of Defendants on Plaintiff's Privacy Act claim.

IV.     **CONCLUSION**

For the foregoing reasons, the court grants Defendants' Motion to Dismiss and for Summary Judgment in its entirety and denies Plaintiff's Motion for Summary Judgment in its entirety.  A separate Order accompanies this Memorandum Opinion.

Dated:  October 13, 2015

Amit P. Mehta
United States District Judge